**CALVERT FIRE INSURANCE COMPANY, Plaintiff,**

v.

**SUSSEX MUTUAL INSURANCE COMPANY, Defendant.**

**Civ. No. 80–4116.**

United States District Court, D. New Jersey.

Dec. 28, 1981.

Pellettieri, Rabstein & Altman by Neal Solomon, Trenton, for plaintiff.

Methfessel & Werbel by Joel Werbel, Rahway, N. J., for defendant.

## MEMORANDUM

BIUNNO, District Judge.

The defendant, Sussex, has a motion set for September 28, to file a 3rd party complaint bringing in Horace Mann Insurance Co.

The plaintiff, Calvert, has filed papers in opposition along with a cross-motion for summary judgment. The affidavits and ex-hibits filed deal with the underlying relationship and contract, prior history of other litigation, and tabulation sheets or schedules in connection with the transactions involved.

The suit arises from a reinsurance pool organized by Newark Reinsurance Management Corporation (NRMC, sometimes referred to in filed papers as Newark Re).

NRMC organized the pool by securing the adherence of a number of companies, each undertaking to reinsure some stated percentage of the insurance ceded to the pool for a particular pool year, a fiscal year running from July 1 to June 30. This case involves pool year 5, from 7/1/73 to 6/30/74.

For that year, both Calvert and Sussex joined the pool by contract with NRMC. Calvert agreed to reinsure 10% of the risks on ceded business, and Sussex undertook 5%. The ceding companies, normally companies not members of the pool, would in effect transfer a particular property or casualty insurance policy to the pool, which would in return receive the premium and assume the risk. Also, only a part of a policy issued by the ceding company might be ceded, in which case the policy was in effect divided as to premium and risk.

This kind of reinsurance arrangement has long been a part of the business of property and casualty insurance and is designed to back the insured risks with the strength of the members of the pool. Without reinsurance, a relatively small company issuing policies may sustain a number of large losses for it in a given year and be financially unable to make the payments, thereby putting all its outstanding policies in jeopardy, and no doubt reducing its ability to sell new policies.

The whole system of insurance is based on the concept of spreading risks among policy holders, so that the aggregate of premiums received, less cost of acquisition and overhead expenses, plus earnings on investments, form a given company's fund from which those who sustain losses are indemnified. This same principle is merely

extended by reinsurance to average the funds and the losses among a larger number of policy holders.

A special rule applied under the reinsurance contract when a pool member ceded to the pool policies it had itself issued. In such instances, the ceding pool member dropped out of the pool for the ceded business. Both the premiums and the risks were divided among the other members of the pool, without participation by the ceding pool member, as though a separate and smaller pool had been formed for that category of ceded business.

Thus, assume the pool had three reinsurers, each taking a ⅓ share. Assume that one of the three ceded one of its own policies to the pool. The premiums paid to the pool on that policy would be divided 50% each by the two remaining companies in the pool, their shares being equal, and if a loss on the ceded policy was sustained, each would be responsible for 50% of the loss on that policy.

NRMC, the pool manager, had operated the pool from 1969 until 1975, when it went bankrupt. Before the bankruptcy, an equity receiver was appointed in Superior Court, Chancery Division, *Horace Mann v. NRMC*, Docket C–4065–74, in Somerset County. In December of the same year, it filed in bankruptcy. No history of the bankruptcy proceeding is provided in the papers on the pending motions.

A word must be said about Horace Mann Insurance Company. It is indicated that when the members of the pool are all "admitted" companies, the ceding company is allowed not to establish its own reserves on policies issued by it and ceded to the pool, for the purposes of its annual report on the "convention statement" adopted by the National Association of Insurance Commissioners (NAIC). This convention form is used to report both for regulatory purposes by the various states, and for the purposes of federal income tax returns.

The convention form had been used for many years before the decision in *U. S. v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), which effectively overruled *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 19 L.Ed. 357 (1869) and, for the first time, held that the insurance business is "commerce" and so subject to federal regulation under the commerce clause. Congress responded by enacting the McCarran-Ferguson Act, 15 U.S.C. § 1011 et seq., by which it withdrew all limitations arising out of the commerce clause on the authority of the States to regulate the insurance business. For this reason, state regulation, including the use of the convention form, continues as before with the States functioning on a coordinated basis through NAIC.

Since Sussex Mutual and a number of other reinsurers in the pool were not "admitted" companies, ceding insurers would have been ∙obliged to establish their own reserves on ceded business. This would be a financial disadvantage for a ceding company and make it more difficult to obtain ceded policies for reinsurance.

NRMC accordingly entered into a separate supplemental or collateral agreement under which Horace Mann Insurance Company undertook to be a "front" member of the pool to an extent sufficient to cover its own share as a pool member, and the aggregate of the shares of other reinsurers in the pool who were not admitted companies. For pool year 5, Horace Mann's actual share was 5%, to which it added 80% as a "front", for a total of 85%. The ancillary agreement authorized NRMC to assign to Horace Mann 85% of ceded business, as a "front", although as between it and other pool members, it was responsible for only a 5% share.

In effect, Horace Mann appeared to ceding companies and to insurance commissioners as an 85% pool member, along with other pool members for the remaining 15% who were also "admitted" companies, that is, authorized to do business in the various States involved in the pool's reinsurance business.

A further discussion must be had of the term "run-off". Under normal conditions, the settlement of accounts within the pool was on a quarterly basis within the fiscal

pool year. However, the process of adjusting and settling losses for claims arising out of an event occurring during a pool year may take time, especially if the claims are litigated. The quarterly settlements are therefore tentative and subject to adjustment later as the claims are closed. Both the process and the time involved are referred to as the "run-off" for the particular pool year.

The equity receiver appointed by the Superior Court undertook the reconstruction of NRMC's books and records, including those for pool year 5. Evidently, they had not properly been kept. The process evidently took more than 5 years. He also issued call notices to pool members in connection with pool year 5 and its run-off. How this came to be done in view of the bankruptcy that followed his designation by only a few months is nowhere explained.

The equity proceeding which culminated in the appointment of the custodial trustee was initiated by Horace Mann Insurance Co. The named defendants were NRMC, Princeton Reinsurance Corp., C & W Financial Corp., and the well-known Pritchard & Baird, Inc., as well as individuals and a family trust. Sussex Mutual was not a named defendant.

Later on, Horace Mann sued Sussex Mutual in Superior Court, Law Division, Mercer County, Docket L–46128–77, and obtained a final judgment on the Amended Complaint in the amount of $605,500.70 on Count I, of $10,111.01 on Count II, and a declaratory judgment on Count III that Sussex Mutual was bound for a 5% share on losses for pool year 5 and its run-off, for which it was obligated to pay to Horace Mann. This judgment was affirmed in the Appellate Division and certification was denied by the Supreme Court.

As noted at the start, Calvert seeks in this suit to recover from Sussex Mutual what it claims to be the latter's share of losses incurred by Calvert under policies issued by it and ceded to the NRMC pool for pool year 5 and run-off.

One of the issues seems to be whether Calvert may recover directly from Sussex

Mutual, basing its claim on the equity proceedings and the judgment in favor of Horace Mann against Sussex Mutual. The problem here is that under the ancillary agreement with Horace Mann, and under the Horace Mann judgment, the ceding company is to look to Horace Mann through NRMC, and once Horace Mann pays NRMC, it may look to Sussex Mutual for indemnity. Exoneration is not mentioned.

The other issue arises out of NRMC's bankruptcy. It would ordinarily be expected that the trustee in bankruptcy would look to the pool members for their shares. These would seem to be Horace Mann for 85% and the other "admitted" pool members making up the other 15%. Payment of their shares would become part of the bankrupt estate for application in payment of those creditors consisting of ceding companies for pool year 5, who may or may not receive 100% of their claims. Horace Mann, in turn, once it had paid, could seek indemnity from the non-admitted companies, such as Sussex Mutual, who composed the 80% segment of Horace Mann's 85% share.

But Horace Mann has already obtained a final judgment against Sussex Mutual for pool year 5, and that judgment may well be res judicata as between them.

Thus, it is evident that there are open questions of fact and law. Does Calvert have a direct claim against Sussex Mutual? If it does, can Sussex Mutual safely pay Calvert in the face of Horace Mann's judgment and the putative claims of NRMC's trustee in bankruptcy? Should there be an interpleader to assure that if Sussex Mutual is liable, it will only pay once? Can the bankruptcy trustee be brought in on interpleader without an order of the bankruptcy court to allow it?

Given these and other open questions, as well as the factual complexity of the case, the cross-motion for summary judgment cannot be granted and it will be ordered denied.

So far as Sussex Mutual's motion is concerned, that motion will be granted. The third-party defendant is not here on the

motion, but will have ample opportunity to be heard once it is in the case.

Submit order accordingly.*

---

* NOTE: The motions set for September 28 were withdrawn on the report that the matter was settled. Later, on being informed that the settlement had not been consummated, the court listed the motions again for December 28. At the call of the motion, no one appeared for Calvert Fire. The court announced it would decide under Rule 78, without oral argument. Counsel for Sussex Mutual asked that the motions be carried to January 11, 1982, and the court said it would consider the request. It has concluded that the motions should be decided rather than adjourned. The decision in no way precludes completion of any settlement that may have been agreed.